## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, DANA NESSEL, *on behalf of the People of Michigan*, STATE OF NEW JERSEY, AND STATE OF NEW YORK,

No. _____

Plaintiffs,

v.

EUGENE SCALIA, *in his official capacity as Secretary of the United States Department of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA,

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro, the State of Illinois, by and through Attorney General Kwame Raoul, the State of Delaware, by and through Attorney General Kathleen Jennings, the District of Columbia, by and through Attorney General Karl A. Racine, the State of Maryland, by and through Attorney General Brian E. Frosh, the Commonwealth of Massachusetts, by and through Attorney General Maura Healey, Dana Nessel, on behalf of the People of Michigan, the State of New Jersey, by and through Attorney General Gurbir S. Grewal, and the State of New York, by and through Attorney General Letitia James, hereby file this Complaint against Defendants Eugene Scalia, in his official capacity as Secretary of the United States Department of Labor, the United States Department of Labor, and

the United States of America (collectively, "Defendants") and, in support thereof, state the following:

**INTRODUCTION**

1.      This lawsuit challenges a new U.S. Department of Labor regulation on the payment of wages to tipped employees. *Tip Regulations Under the Fair Labor Standards Act (FLSA)*, 85 Fed. Reg. 86,756 (Dec. 30, 2020) (to be codified at 29 C.F.R. §§ 10, 516, 531, 578-80) ("Final Rule"). The Department's Final Rule unlawfully removes the cap on the amount of time a tipped worker may spend on non-tipped, related duties and still receive only the tipped, sub-minimum wage, in contravention of the Fair Labor Standards Act ("FLSA" or "Act"). The Final Rule also adopts an overbroad test to determine whether employees are managers or supervisors (who are ineligible to participate in mandatory tip pools) that will exclude certain low wage workers from access to tip pools. The Final Rule will significantly reduce tipped workers' wages, thereby exacerbating the impact the COVID-19 pandemic has had on millions of tipped workers nationwide. The Final Rule will harm Plaintiff States' economic and quasi-sovereign interests.

2.      The FLSA was passed to ensure a fair day's pay for a fair day's work and was amended to provide a credit against the minimum wage for employers of tipped workers. To take advantage of the tip credit, employers must notify employees of their decision to take the credit and track their employees' time and tips to ensure that employees earn at least the mandated minimum wage rate for all hours worked over an individual workweek. In addition, the employee must be in an occupation that regularly produces tips. The tip credit may not be taken for work that is unrelated to a tipped occupation, such as when a server picks up a shift as a dishwasher or cook. That is, the employee must be paid the full minimum wage for all time spent washing dishes, regardless of their tip earnings that week as a server. The Department has

addressed the contours of the tip credit and how it applies to dual jobs and other, non-tipped tasks through rulemaking and sub-regulatory guidance.

3.       For over thirty years, the FLSA and the Department's "Dual Jobs" regulation, 29 C.F.R. § 531.56(e), have been interpreted by the Department and the courts to impose a twenty percent limit on the amount of time tipped workers may spend on duties that are related to their tipped occupation, but are not tip-producing themselves, such as a restaurant server rolling silverware into napkins before or after waiting tables. This sub-regulatory guidance is known as the "80/20 rule." The 80/20 rule ensures that an employer may only assign non-tipped duties for twenty percent or less of the tipped employee's work time in order to benefit from the tip credit against its minimum wage obligations.

4.       The Department's stated impetus for its Final Rule is to address the 2018 amendments to section 3(m) of the FLSA, which were enacted in the Consolidated Appropriations Act of 2018. Pub. L. 115-141, 132 Stat. 348 (2018) ("2018 CAA"). These amendments prohibit employers, including managers and supervisors, from keeping employees' tips. The amendments also authorize employers to establish mandatory tip pools between tipped and non-tipped employees as long as the employer pays the full minimum wage to all employees without taking a tip credit. This is particularly significant in the restaurant industry where "back of the house" workers like line cooks can now participate in tip pools with "front of the house" workers like bartenders and wait staff. The Department's abandonment of the 80/20 rule, however, has nothing to do with the 2018 amendments to the FLSA.

5.       The Department's Final Rule reverses decades of policy and practice by removing the twenty percent bright-line cap on non-tipped, related duties an employee may perform while receiving the sub-minimum wage. In its place, the Department imposes a vague standard that

contains no limitation on the non-tipped duties a tipped employee may be required to perform. The Final Rule states: "An employer may take a tip credit for *any hours* that an employee performs related, non-tipped duties *contemporaneously with* his or her tipped duties, or *for a reasonable time immediately before or after* performing the tipped duties." Final Rule at § 531.56(e)(2) (emphasis added). Without any analysis, the Final Rule also significantly expands the universe of duties that are considered "related, non-tipped duties." The Final Rule will require tipped workers to perform more work for less pay, transferring wages to their employer–but the Department provided no estimate of its effect on workers.

6. In the Final Rule, the Department imports the duties test from the FLSA's executive employee exemption regulation to determine which individuals are managers or supervisors who may not keep tips under section 3(m)(2)(B). 29 CFR 541.100(a)(2)–(4). However, the Department fails to incorporate the executive exemption's salary test. *Id*. Without a salary test such as that used by the Department to identify bona fide managerial employees exempt from the FLSA's overtime requirements, the Final Rule's duties test is too broad and is likely to result in non-managerial employees being excluded from tip pools, which will reduce wages for these workers.

7. And while Congress did not impose a requirement that violations of the prohibition against keeping workers' tips be "willful" in order to subject violators to civil money penalties, the Final Rule nonetheless includes a willfulness requirement. Moreover, under the guise of implementing the 2018 Consolidated Appropriations Act's amendments to the FLSA relating to tipped employees, the Department redefines its definition of willfulness to weaken the deterrent effect of civil money penalties for any type of violation, not just those relating to tipped employees. Specifically, the Final Rule redefines willfulness by eliminating provisions that

deemed a violation willful when the Department provides advice to an employer that it chooses not to follow and that required employers to inquire into their legal obligations in some circumstances.

8.      Plaintiffs, the Commonwealth of Pennsylvania, the State of Illinois, the State of Delaware, the District of Columbia, the State of Maryland, the Commonwealth of Massachusetts, Dana Nessel, on behalf of the People of Michigan, the State of New Jersey, and the State of New York, bring this action to vacate the Final Rule and enjoin its implementation because it is contrary to Defendants' statutory jurisdiction, authority, and limitations in violation of the APA, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

9.      This action arises under 5 U.S.C. § 702. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

10.     In addition, this Court has the authority to issue the declaratory relief sought pursuant to 5 U.S.C. §§ 705, 706 and 28 U.S.C. §§ 2201, 2202.

11.     Venue is proper in this Court because a defendant resides in this district, Plaintiff Commonwealth of Pennsylvania resides in this district, a substantial part of the events giving rise to this action occurred in this district, and no real property is involved. *See* 28 U.S.C. § 1391(b)(2) and (e)(1).

## THE PARTIES

12.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1.

13.     Plaintiff the State of Illinois, represented by and through its Attorney General, Kwame Raoul, is a sovereign state of the United States of America. The Attorney General is the chief legal officer of the State, Ill. Const. 1970, art. V, § 15, and is authorized to pursue this action under 15 ILCS 205/4.

14.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

15.     Plaintiff the District of Columbia ("District") is a sovereign municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

16.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through Attorney General Brian E. Frosh, its chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file

suit to challenge action by the federal government that threatens the public interest and the welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

17.     Plaintiff the Commonwealth of Massachusetts is represented by Attorney General Maura Healey, its chief law officer, who is granted traditional common law duties to represent the Commonwealth and broad statutory authority to act in the public interest.  M.G.L. c. 12, § 3; *Feeney v. Commonwealth*, 373 Mass. 359, 366, 366 N.E. 2d 1262, 1266 (1977).

18.     Plaintiff Dana Nessel, on behalf of the People of Michigan, is the Attorney General. Dana Nessel is Michigan's chief law enforcement officer and is authorized to pursue this action by Mich. Const. art. V, § 3 and Mich. Comp. Laws § 14.28.

19.     Plaintiff the State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. N.J. Stat. Ann. § 52:17A-4(e), (g).

20.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

21.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Final Rule harms their quasi-sovereign and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated.

22.     Defendant Eugene Scalia is the Secretary of the United States Department of Labor and is sued in his official capacity. His official address is 200 Constitution Avenue NW, Washington, D.C. 20210.

23.     Defendant United States Department of Labor ("DOL" or "Department") is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f). The Department promulgated the Final Rule and is responsible for its enforcement. Its principal address is 200 Constitution Avenue NW, Washington, D.C. 20210.

24.     Defendant the United States of America is sued as allowed by 5 U.S.C. § 702.

## BACKGROUND

### The Fair Labor Standards Act and the Tip Credit

25.     The FLSA was passed in 1938 to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers[.]" 29 U.S.C. § 202. It requires employers to pay a minimum hourly wage, but the original Act omitted restaurant and hotel workers. 29 U.S.C. § 206(a)(1)(C).

26.     Since its enactment, the FLSA has been amended several times to delineate its applicability to tipped workers. These amendments chart the history of the tip credit provision and demonstrate Congress's continued interest in protecting tipped workers while allowing employers to benefit from tips they receive. Over time, the Department has also conducted rulemakings to clarify this congressional purpose.

27.     The FLSA's provisions relating to tipped workers were first amended in 1966, extending the law's protections to restaurant and hotel workers. Fair Labor Standards Amendments of 1966, Pub. L. 89-601, 80 Stat. 830. The 1966 amendments also altered the definition of the term "wage" to create a "tip credit," thus permitting employers to utilize tips collected and retained by customarily tipped workers as an offset against a portion of the employer's minimum wage obligation. *Id.*; 29 U.S.C. § 203(m). A "tipped employee" is defined

as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." *Id.*; 29 U.S.C. § 203(t).

28.     The FLSA was again amended in 1974 to preserve the tip credit. Fair Labor Standards Amendments of 1974, Pub. L. 93-259, 88 Stat. 55. At that time, the Senate Committee on Labor and Public Welfare considered reducing the tip credit but "was impressed by the extent to which customer tips contributed to the earnings of some hotel and restaurant employees[.]" Staff of S. Comm. on Labor and Public Welfare, 94th Cong., Legislative History of the Fair Labor Standards Amendments of 1974, Vol. 1 at 682-83 (Comm. Print 1976).

29.     After reviewing the estimates of tip earnings in a March 1970 study, "the Committee was persuaded that the tip allowance should not be reduced . . . *but that the tipped employee should have stronger protection to ensure the fair operation of [the tip credit] provision.*" *Id*. (emphasis added).

30.     To accomplish its goal of ensuring the fair operation of the tip credit provision, Congress prohibited employers from utilizing the tip credit unless their employees were first informed of the provisions of section 3(m). Congress further declared all tips property of employees who received them, except that tip pools may be established among employees who "customarily and regularly receive tips." Fair Labor Standards Amendments of 1974, Pub. L. 93-259, 88 Stat. 15.

31.     Thus, the clear purpose of the 1974 amendments to the tip credit provision was to strengthen protections for tipped workers while maintaining the tip credit.

32.     In 1996, Congress again amended the FLSA to streamline the calculation of the tip credit. Small Business Job Protection Act of 1996, Pub. L. 104-188, 110 Stat. 1755. Starting in August 1996, the new amendments allowed employers to take a tip credit of the difference

between the current non-tipped minimum wage, now $7.25 per hour, and the tipped minimum wage in effect as of August 20, 1996, or $2.13 per hour, for a maximum credit of $5.12 per hour. *Id.*

33.     Following the 1996 amendments, the tip credit provision remained unchanged until 2018, when Congress amended the FLSA to prohibit employers, including managers and supervisors, from keeping employees' tips. 2018 CAA; 29 U.S.C. § 203(m)(2)(B). The amendments also authorize employers to establish mandatory tip pools between tipped and non-tipped employees as long as the employer pays the full minimum wage to employees without taking a tip credit. *Id*.

34.     Currently, the FLSA permits employers to pay a sub-minimum wage, now $2.13 per hour under federal law, by taking a credit for tips employees receive "which amount is equal to the difference between" the tipped minimum wage and the non-tipped minimum wage, currently $7.25 per hour. 29 U.S.C. § 203(m)(2)(A)(ii).  Thus, an employer may take a tip credit of up to $5.12 per hour, so long as the worker actually earns that amount in tips. But it is a core tenet of the FLSA that workers be compensated fairly for their work and must be paid at least the full minimum wage when not engaged in tipped work.

35.     While allowing employers to reduce their obligation as a result of employee tips, the FLSA "was designed to extend the frontiers of social progress by insuring to all our able[-]bodied working men and women a fair day's pay for a fair day's work." *Belt v. P.F. Chang's China Bistro, Inc.*, 401 F. Supp. 3d 512, 538 (E.D. Pa. 2019) (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). "A 'fair day's pay for a fair day's work' can be guaranteed only if employers' ability to take the tip credit is limited to when their employees are actually 'engaged in a tipped occupation.'" *Id.* The tip credit is not without its limits.

## The Dual Jobs Regulation and the 80/20 Rule

36.     To implement the tip credit provisions of the FLSA, the Department promulgated the "Dual Jobs" regulation, among others. 32 Fed. Reg. 13,575, 13,580-81 (Sept. 28, 1967) (29 C.F.R. 531.56(e)).

37.     The Dual Jobs regulation explains that, when an employee works in both a tipped and non-tipped position, such as a hotel maintenance worker who also works as a server, "no tip credit can be taken for [the] hours of employment in [the] occupation of maintenance [worker]." *Id.* at 13,581. That is, the employer must pay the full minimum wage for every hour an employee works as a maintenance person but may take the tip credit for hours that employee works as a server.

38.     However, with respect to an employee who "occasionally" or "part of [the] time" performs "related duties in an occupation that is a tipped occupation" but are "not by themselves . . . directed toward producing tips," the employer may take advantage of the tip credit. For example, a server who rolls silverware or refills condiments for a few minutes may still be paid the tipped minimum wage for that time.

39.     Since 1988, the Department has interpreted the "occasionally" or "part of [the] time" language of the Dual Jobs regulation to cap the amount of time a worker may spend on related, non-tipped duties at twenty percent of the time in the workweek—the "80/20 rule." *See* U.S. Dep't of Labor, Field Operations Handbook, § 30d00(f)(1)-(4) (rev. Dec. 15, 2016).

40.     Except for a brief period in 2009, the 80/20 rule remained the Department's position until 2018, when the Department issued an Opinion Letter, amended the Field Operations Handbook, and issued a Field Assistance Bulletin, abandoning the 80/20 rule in favor of a new rule permitting the tip credit for "any time" an employee spends on related, non-tipped duties.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2018-27 (Nov. 8, 2018),

2018 WL 5921455; U.S. Dep't of Labor, Field Operations Handbook, § 30d00(f)(1)-(4) (rev.

Feb. 15, 2019); U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletin No. 2019-2

(Feb. 15, 2019). The sub-regulatory guidance provides:

> An employer may take a tip credit for any amount of time that an employee
> spends on related, non-tipped duties performed contemporaneously with the
> tipped duties—or for a reasonable time immediately before or after performing
> the tipped duties—regardless whether those duties involve direct customer
> service.

41.     The Department's attempt to eliminate the 80/20 rule through sub-regulatory

guidance failed to accomplish its aim as courts have found the interpretation unreasonable. The

80/20 rule "was consistently awarded *Auer* deference by the federal courts." *Belt v. P.F. Chang's

China Bistro, Inc.*, 401 F. Supp. 3d 512, 534 (E.D. Pa. 2019) (finding the Dual Jobs regulation

reasonable, the Department's attempt to eliminate the 80/20 rule "unreasonable," affording no

deference to it, and listing other contexts in which the Department has drawn a line at twenty

percent of time). The *Belt* court noted that the Department's interpretation is unreasonable and

does not reflect fair and considered judgment. First, the regulation was internally inconsistent—

"is there some limit on the amount of related and untipped work a tipped employee can perform

before he or she become[s] engaged in 'dual jobs,' or is there no limit?" *Id.* at 533. Second, the

"contemporaneously" limitation "leads to an absurd result," apparently envisioning "an

employee who is performing tipped work, such as taking a customer's order, while at the exact

same time performing untipped related work, such as filling salt shakers." *Id.* Finally, the

"reasonable amount of time before or after" limitation "could be a permissible construction," if

limited to twenty percent of the employee's time. *Id.* at 533, 536-37.

### The Department's Ongoing Attempts to Transfer Tips to Employers

42.     In December 2017, the Department issued a Notice of Proposed Rule Making

("NPRM") that sought to amend its tip regulations to give employers complete freedom over

how tips are distributed. *Tip Regulations Under the Fair Labor Standards Act*, 82 Fed. Reg. 57,395 (Dec. 5, 2017) (withdrawn Oct. 8, 2019) ("2017 NPRM").

43. Under the 2017 NPRM, employers would not only have been free to mandate tip sharing with "back of the house employees" like line cooks, but they would have been free to mandate tip sharing with managers and supervisors. As part of its 2017 Proposed Rule, the Department proposed rescinding 29 C.F.R. § 531 Part D, the provisions governing employers of tipped employees, to the extent that they apply to employers that do not avail themselves of the tip credit. *Id.* at 57,401. In contravention of the FLSA, the 2017 Proposed Rule would have permitted employers to keep employee tips in order to "make capital improvements" or "lower menu prices" if they so desired, so long as they paid tipped employees the full minimum wage. *Id.* at 57,407-08.

44. The Department's 2017 Proposed Rule provoked congressional action to amend the FLSA to prevent employers, including managers and supervisors, from taking employees' tips. 2018 CAA. Rather than abandon the rulemaking, the Department pressed on, issuing the 2019 Proposed Rule which withdrew the 2017 proposal. Now, the Department has finalized its proposal just weeks after the Office of Inspector General determined it followed an unsound process in the 2017 proposal, which served as the genesis of the Final Rule.

### The Unsound 2017 Rulemaking Process

45. On December 11, 2020, the Department's Office of Inspector General ("OIG") published a report finding that the Department did not conduct a sound rulemaking process in issuing the 2017 proposed rule. The OIG was particularly concerned with the Department's efforts to bury data quantifying the cost of the 2017 Proposed Rule on tipped workers while claiming in the NPRM that it lacked the data to quantify such costs.

46.     The Department did not release any estimate of the 2017 Proposed Rule's impact on workers, claiming that it lacked the necessary data to determine the 2017 Proposed Rule's impact on employee earnings. *Id.* at 57,396; 57,408.

47.     Following news reports that the Department did, in fact, conduct an analysis of the 2017 Proposed Rule's impact on employee earnings, OIG opened an investigation into the Department's rulemaking process in issuing the 2017 Proposed Rule. U.S. Dep't of Labor, Office of Inspector Gen., Office of Audit, Report No. 17-21-001-15-001, *DOL Did Not Demonstrate It Followed A Sound Process In Promulgating the 2017 Tip Rule Notice of Proposed Rulemaking* (Dec. 11, 2020) ("OIG Report").[1]

48.     The OIG Report found that the Department did not follow a sound rulemaking process; instead, among other things, it found that the Department did not adequately support its decision to exclude an economic impact analysis in the 2017 Proposed Rule and that the Department of Justice, Office of Solicitor General ("DOJ-OSG") influenced the rulemaking process. *Id.* at 5-9.

49.     OIG confirmed that the Department was aware of the requirement that agencies conduct economic impact analyses for all regulatory actions deemed economically significant and conducted an analysis to determine the potential transfers from tipped workers to non-tipped workers and employers that could result from the 2017 Proposed Rule. *Id*. at 11.

50.     However, the Department ultimately did not release the results of its economic impact analysis after "pressure" from DOJ-OSG and, instead, stated falsely that it "lack[ed] data to quantify possible reallocations of tips through newly expanded tip pools." *Id.* at 12; 2017 NPRM at 57,396.

---

[1] https://www.oig.dol.gov/public/reports/oa/2021/17-21-001-15-001.pdf

51.     The OIG Report stated that the Department was not able to identify flaws in its data sets or transfer calculations that the agency believed would render its economic impact analysis insufficient to estimate the impact of the 2017 Proposed Rule. *Id.* at 12-13.

52.     The Department was also aware that agencies are required to determine whether a regulatory action will affect the disposable income or poverty of families and children, and whether the proposed benefits of the action justify the financial impact on families. *Id.* at 14-16.

53.     The Department failed entirely to conduct an analysis of the impact of the 2017 Proposed Rule on families because it "decided an individual tipped employee did not meet the definition of [a] family," *id.* at 14-15, ignoring that many tipped individuals may be the primary wage-earners in households with families or contribute to household income, *id.* at 15-16.

54.     The Department did not disclose this decision in the 2017 Proposed Rule but merely stated that it would not have a significant impact on families. *Id.* at 16.

55.     According to news reports, the Department estimated that the 2017 Proposed Rule would have cost workers billions of dollars in lost tips. Ben Penn, *Labor Dept. Ditches Data on Worker Tips Retained by Businesses*, Bloomberg Law Daily Labor Report Feb. 1, 2018.[2]

56.     Instead of modifying its rulemaking process to correct the practices highlighted by the OIG Inspector's Report, the Department proceeded to issue sub-regulatory guidance, a 2019 NPRM, and the Final Rule that all bear the same deficiencies as the 2017 NPRM and will result in the transfer of millions of dollars from tipped workers to employers without any reasoned analysis.

---

[2] https://bnanews.bna.com/daily-labor-report/labor-dept-ditches-data-on-worker-tips-retained-by-businesses

## Congress Responded to the 2017 NPRM by Amending the FLSA in 2018

57.     In 2018, Congress amended the Act to make clear that employers may not keep employee tips for any purpose, rejecting the 2017 NPRM. Consolidated Appropriations Act 2018, Pub. L. 115-141, 132 Stat. 348; 29 U.S.C. § 203(m)(2)(B).

58.     Congress once again signaled its support for protecting tipped workers—this time by amending the FLSA to explicitly forbid employers from keeping employees' tips "for any purposes, including allowing managers or supervisors to keep any portion of employees' tips," even if the employer does not make use of the tip credit. *Id.*

59.     Congress also provided for civil money penalties for employers that illegally keep employee tips. Consolidated Appropriations Act 2018, Pub. L. 115-141, 132 Stat. 348; 29 U.S.C. § 216(e)(2).

## The 2019 Proposed Rule

60.     Prompted by Congress's 2018 amendments to the FLSA, the Department issued the proposed rule, *Tip Regulations Under the Fair Labor Standards Act (FLSA)*, 84 Fed. Reg. 53,956 (Oct. 8, 2019) ("2019 NPRM"). The 2019 NPRM ostensibly implemented Congress's mandate by clarifying when employers may impose mandatory tip pools and which employees may participate, but, in actuality, it reached far beyond the scope of the 2018 FLSA amendments and issued the provisions challenged in this suit. *See* 2019 NPRM at 53,956. The 2019 NPRM withdrew the 2017 NPRM. *Id.*

61.     The Department proposed to replace the twenty percent cap on related, non-tipped duties that tipped employees can be required to perform while employers take the tip credit, with amorphous, undefined terms. The Department's proposal provided: "An employer may take a tip credit for *any amount of time* that an employee performs related, non-tipped duties *contemporaneously with* his or her tipped duties, or for a *reasonable time immediately before or*

*after* performing the tipped duties." 2019 NPRM at § 531.56(e)(2). The Department's proposal failed to define the terms a "reasonable time" and "contemporaneous with." *See* 2019 NPRM at 53,975.

62. Relying on its own recent sub-regulatory guidance—the 2018 Opinion Letter, 2019 Field Assistance Bulletin, and 2019 Field Operations Handbook—the Department explained that "[t]he proposed regulation would *clarify* that an employer may take a tip credit for *any amount of time* that an employee performs related, non-tipped duties *contemporaneously with* his or her tipped duties, or for a *reasonable time immediately before or after* performing the tipped duties." *Id.* at 53,964 (emphasis added). "Clarify" here means changing the rule by removing the cap.

63. The 2019 NPRM also proposed to expand dramatically the universe of duties that may be considered "related, non-tipped duties" to include tasks that the Department has long deemed unrelated to the tipped occupation and requiring payment of the full minimum wage without taking the tip credit. Specifically, the 2019 NPRM also proposed using the Occupational Information Network ("O*NET") to determine whether specific non-tipped duties are related to a tipped occupation. O*NET is an online database containing hundreds of standardized and occupation-specific descriptors for almost 1,000 occupations. These descriptions of workers' duties are obtained through randomized surveys of employers and workers.[3] Therefore, O*NET contains tasks workers and employers in service occupations—industries with a high incidence of wage violations report in certain occupations—regardless of whether those duties are related to their tipped occupation. O*NET was not created to demonstrate whether the job duties reported by tipped workers are related or unrelated to tipped work. Nonetheless, any duties

---

[3] https://www.onetcenter.org/dataCollection.html

appearing on this database now, or in the future, will be presumed related to the tipped occupation.

64.     Conspicuously, the 2019 NPRM contained no estimate of the number of workers it would affect or its effect on their wages. The Department claimed it "lack[ed] data to quantify any potential costs, benefits, or transfers which may be associated with the implementation of this policy," as it did with the 2017 NPRM—despite actually having data that contradicted its position. *Id.* at 53,967.

65.     The 2019 NPRM admits, however, that "employment of . . . dishwashers and cooks[] may fall" as a result of the regulation because tipped workers may perform more of those non-tipped duties. *Id.*at 53,972.

66.     In addition, the 2019 NPRM admits that "tipped workers might lose tipped income by spending more of their time performing duties where they are not earning tips, while still receiving cash wages of less than minimum wage." *Id.*

67.     The Department provided an example in which a worker earned $12 per hour in tips with the twenty percent limit:

> With no 20 percent limit on the performance of related, non-tipped duties, an employee might spend more than 12 minutes per hour performing related, non-tipped duties, as long as they still receive enough tips to earn at least $7.25 per hour for the shift. Thus, if an employee now spends 20 minutes performing non-tipped work (i.e., 33 percent of their shift) and 40 minutes interacting with customers, *they would be expected to lose $2 per hour in tips*, a decrease accounting for eight fewer minutes per hour spent performing tip-generating work (i.e., 8 minutes × $0.25 per minute).

*Id.* (emphasis added). Thus, the Department's own estimate is that the Final Rule would result in a *fourteen percent reduction in income* for the hypothetical tipped worker.

68.     The 2019 NPRM contains no analysis of a regulatory alternative to the rescission of the 80/20 rule, such as combining the "reasonable time" standard with a hard cap. *Id.* at 53,973.

69.     As noted above, the Department's 2017 NPRM was criticized by the OIG Report for claiming, without analysis, that the proposed rule would not adversely impact the well-being of families. OIG Report at 15. The Department's 2019 NPRM, nonetheless, did not mention—let alone provide an analysis of—how the proposed benefits of the 2019 NPRM justified the potential financial impact on families, as required by Section 654 of the Treasury and General Government Appropriations Act, 1999.

70.     Additionally, the 2019 NPRM proposed a willfulness requirement for civil money penalties for violations of § 203(m)(2)(B) despite the absence of statutory language requiring a willful violation for the imposition of civil money penalties for violations of this section. 2019 NPRM at 53,964.  The 2019 NPRM amended the Department's definition of willful violations across the board for any violations of the Act.

71.     Finally, the 2019 NPRM also proposed to use a duties test but no salary threshold to determine which employees are managers or supervisors that may not participate in tip pools. 2019 NPRM at 53,961-62.

72.     The Department received 466 comments in response to its 2019 NPRM. Multiple commentators raised concerns about the Department's failure to justify its departure from the thirty-year-old 80/20 rule and the Department's failure to provide any detailed analysis or consideration to the impact of its proposed rule on workers, the confusion it would create for employers, and the burdens it would impose on state enforcement efforts.

73.     Commentators also raised concerns over the Department's unjustified amendment of its definition of willfulness, weakening the effect of civil money penalties, in contravention of Supreme Court precedent as well as its decision to import into the FLSA a willfulness requirement for the imposition of civil money penalties for violations of the amended provisions of  section 203(m)(2)(B).

74.     Finally, commentators also expressed their concerns that the Department's failure to include a salary threshold to determine which employees are managers or supervisors that may not participate in mandatory tip pools was overbroad and would cause certain low wage workers to be excluded from the tip pool and lose out on wages.

## The Final Rule

75.     The Department issued the Final Rule on December 30, 2020, in the midst of the global COVID-19 pandemic and just weeks after the OIG Report condemned the 2017 NPRM. 85 Fed. Reg. 86,756 (Dec. 30, 2020). Now, in this administration's final days, unable to accomplish its goal through sub-regulatory guidance, the Department has amended the Dual Jobs regulation itself to codify its deletion of the twenty percent cap and permit employers to take the tip credit for "any hours" tipped employees spend on related, non-tipped duties.

76.     The Final Rule implements the 2019 NPRM with few changes. *See* Final Rule at 86,762. In responding to comments, the Department determined to maintain each challenged provision of the rule, including eliminating the 80/20 rule, imposing a willfulness requirement, redefining willfulness, failing to implement a salary threshold to identify bona fide managers or supervisors, and incorporating the O*NET occupational definitions.

77.     The Department identifies as the primary justification for rescinding the 80/20 rule that it "was difficult for employers to administer and led to confusion," and was "onerous for employers," but replaces the bright line with an undefined standard that still requires

employers to track their employees' tasks and time to ensure the non-tipped work is related and reasonable. Final Rule at 86,767.

78. The Final Rule includes the 2019 NPRM's willfulness requirement for civil money penalties—despite there being no such requirement in the statute—when an employer illegally keeps tips. *Compare* FLSA § 203(m)(2)(B) *with* 29 C.F.R. § 578.3(a).

79. The Final Rule sweepingly amends the willfulness standard across the FLSA, because it provides that "an employer's receipt of advice from WHD that its conduct is unlawful and its failure to inquire further regarding the legality of its conduct are each 'a relevant fact and circumstance' in determining willfulness," but not determinative. *Id.* at 86,773.

80. Further, the Department failed to incorporate a salary threshold for assistance in identifying bona fide "managers" or "supervisors," as commenters suggested, instead using only a duties test borrowed from the executive exemption. § 531.52(b)(2).

81. The Final Rule emphasized its reliance on O*NET to determine whether a non-tipped duty is related to the tipped occupation and provides that the O*NET tasks for an occupation, though comprehensive, are not exhaustive. In this way, the Final Rule is even broader than the 2019 NPRM.

82. The Department applauds itself in the Final Rule for lowering employers' monitoring costs associated with the tip credit, though the Department does not provide any data establishing that monitoring costs were particularly burdensome or that they will, in fact, be lower. *See* Final Rule at 86,767.

83. The Final Rule contains an example that purports to tout its reasonableness. The Department explains that a bellhop who works an eight-hour shift performing tipped duties and then two hours performing non-tipped duties must be paid the full minimum wage for the two

hours of non-tipped duties because it is not a "reasonable time" after the shift. Final Rule at 86,769. But the same bellhop who works a ten hour shift and performs two hours of non-tipped duties throughout that shift (approximately twelve minutes per hour) could be paid the tipped minimum wage for all hours worked that shift. *Id.* The example seems to indicate that the "reasonability" of the non-tipped time depends on the nominal length of the shift or how busy an employee is during the shift, but provides no limit to non-tipped duties other than two hours after a shift.

84.     The Final Rule also claims without explanation that the new "reasonable time" method requires less specificity in evaluating whether a particular task is tipped or non-tipped. Final Rule at 86,769.

85.     Although the Department requested data in order to quantify the effect on tipped workers of rescinding the 80/20 rule, it disregarded the analysis commenters provided. *See* Final Rule at 86,784-86.

86.     The Department argues in the Final Rule that the 80/20 rule actually allows greater exploitation of tipped workers than its new method but also admits that the new rule will primarily benefit employers. Final Rule at 86,786. The Final Rule provides that the "efficiencies" the rule advances may result in higher employee earnings despite acknowledging that "transfers" from employees to employers "could occur in some cases." *Id.* Specifically, the Department "believes" without basis that "employers will see a reduction in regulatory cost and be able to adopt work arrangements that better serve customers, leading to more business and greater tips." *Id.*

# ALLEGATIONS

## I.  The Final Rule is Unlawful Under the Administrative Procedure Act.

### A.  The Final Rule's Abandonment of the 80/20 Rule is Contrary to the Text and Purpose of the FLSA and to Supreme Court Precedent.

87.    The Final Rule renders meaningless the statutory definition that a tipped worker must be "engaged in an occupation" which receives tips, instead substituting a non-exhaustive list of related, untipped tasks which may be considered part of a tipped occupation. *See* 29 U.S.C. § 203(t). When employees "spend more than twenty percent of their time performing untipped related work," they are no longer "engaged in an occupation in which [they] customarily and regularly receive[] . . . tips." *Belt*, 401 F. Supp. 3d at 526.

88.    The former Dual Jobs regulation, interpreting "engaged in an occupation" in which a tipped worker performs untipped duties only "occasionally" or "part of [the] time" to impose a twenty percent cap on untipped duties has been afforded *Chevron* deference by the United States Courts of Appeals for the Eighth and Ninth Circuits as well as multiple district courts. *Belt*, 401 F. Supp. 3d at 529 (collecting cases).

89.    The Final Rule fails to limit the hours of non-tipped work tipped workers may be instructed to complete by their employer in direct contravention of the purposes and limitations of the tip credit crafted by Congress.

90.    Defendants' decision to require a willful violation of Section 203(m)(2)(B) to impose civil money penalties is also contrary to the plain text of the statute. *Compare* Final Rule at § 578.3 *with* 29 U.S.C. § 216(e)(2).

91.    The Final Rule's provisions that an employer's ignoring Department advice is a mere factor to be considered and deleting the requirement that an employer make an adequate

inquiry contradict the Supreme Court's long-established definition of willfulness. Final Rule at § 578.3(c).

### B. The Final Rule's Willfulness Requirement and Its Definition of Willfulness Are Contrary to Law.

92.     The Supreme Court has explained that "willful" refers to "conduct that is not merely negligent"; that is, the "employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Richland Shoe*, 486 U.S. at 133.

93.     For nearly thirty years, the Department has incorporated the Supreme Court's definition into its regulations, describing a violation as "willful" where "the employer knew that its conduct was prohibited by the Act or showed reckless disregard for the requirements of the Act." 29 C.F.R. § 578.3(c) (Dec. 3, 1992). Further, the regulations provide that "[a]ll of the facts and circumstances surrounding the violation shall be taken into account in determining whether a violation was willful." *Id.*

94.     The Final Rule makes the "receipt of advice from a responsible official of the Wage and Hour Division to the effect that the conduct in question is not lawful" a mere factor to be considered in determining whether conduct is willful. The Final Rule also removes an employer's failure to inquire further into whether its conduct was in compliance with the Act from the Department's description of willfulness. Final Rule at § 578.3(c). The Final Rule's description of willfulness contradicts the Supreme Court's long-established definition. The Department's Final Rule encourages employers to ignore the advice of the Department's compliance officers. This will create confusion among employers, and will create administrative and enforcement burdens for the Plaintiff states.

95.     Additionally, the Final Rule imports a willfulness requirement into violations of the recently amended provisions of the FLSA in contravention of Congressional intent.

96.     Section 16(e)(2) of the FLSA states that "any person who repeatedly or willfully violates sections 206 or 207 of this title, relating to wages, shall be subject to a civil penalty not exceeding $1100 for each violation." Accordingly, the Act imposes civil money penalties on employers that repeatedly or willfully violate the Act's minimum wage and overtime requirements.

97.     Section 1201(b)(3) of the 2018 Consolidated Appropriations Act amended section 16(e)(2) of the FLSA to add that "[a]ny person who violates section 3(m)(2)(B)," (the prohibition on employers, including managers and supervisors from keeping employees' tips) "shall be subject to a civil penalty not to exceed $1,100 for each such violation, as the Secretary deems appropriate."

98.     Unlike Congress' imposition of civil money penalties relating to violations of the minimum wage and overtime requirements of the FLSA, Congress did not make the imposition of civil money penalties for violations of section 3(m)(2)(B) of the Act contingent upon a finding of willfulness. Contrary to Congress' intent, however, the Final Rule hinges imposition of civil money penalties for violations of section 3(m)(2)(B) of the Act upon a finding of willfulness.

**C.  The Final Rule Is Arbitrary and Capricious**

99.     The Final Rule is arbitrary and capricious because it fails to consider and quantify the effect on tipped workers while ignoring evidence that contradicts its position. Further, the Final Rule is an unjustified break with decades of consistent application of the Dual Jobs regulation.

100.    The Department has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, and offered an explanation for its decision that runs counter to the evidence before the agency.

101.     The Final Rule does not examine the relevant considerations and articulate a satisfactory explanation for its action that includes a rational connection between the facts found and the choice made. It fails to reflect upon contrary evidence to the rule and treats contrary evidence in a conclusory fashion.

102.     The Final Rule fails to establish good reasons for its change in position and does not consider that its longstanding policy may have engendered serious reliance interests that must be taken into account.

103.     For example, many states, including some Plaintiff states, have long looked to the FLSA and to the Department's regulations for guidance when interpreting their own wage laws. The 80/20 rule has been the law for thirty years. The Department failed to consider the confusion that its rash abandonment of the 80/20 rule would cause among employers subject to state requirements that follow the 80/20 rule, or the administrative burden this departure would cause for states' enforcement efforts.

>    **i.     The Department failed to consider or quantify the effect the rule would have on workers and their families and ignored evidence of those effects.**

104.     The Department claims that the Final Rule will lower costs related to monitoring tipped employees' time spent on various tasks but failed to demonstrate that employers actually incur any such burdensome costs. 85 Fed. Reg. at 86,767. In fact, the rule still requires employers to differentiate between tipped and non-tipped tasks and ensure that time spent on non-tipped tasks is "reasonable."

105.     However, the Department's lack of reasoned decision-making is perhaps best demonstrated by its refusal to conduct any meaningful analysis of the cost of the most significant change the rule makes—eliminating the twenty percent cap on related, non-tipped duties—to the millions of tipped workers nationwide.

106.     In the 2019 NPRM, the Department stated that it "lacks data to quantify any potential costs, benefits, or transfers which may be associated with the implementation of" the revised Dual Jobs regulation, a claim with questionable credibility in light of the OIG's findings from its investigation into the 2017 rulemaking process. 84 Fed. Reg. at 53,967.

107.     In response to the Proposed Rule, commenters raised serious concerns that replacing the 80/20 rule with a vague standard that places no limit on the amount of time tipped employees can be required to spend on non-tip-producing work would have a devastating effect on their income.

108.     The Economic Policy Institute ("EPI") estimated that workers would lose more than $700 million annually under the proposed rule. EPI Comment at 4;[4] *see* Heidi Shierholz and David Cooper, *Workers will lose more than $700 million annually under proposed DOL rule,* Economic Policy Institute (Nov. 30, 2019).[5]

109.     The EPI analysis of the Rule was of the sort that the Department would normally produce but the Department disregarded it in the Final Rule, claiming it relied on flawed methods and assumptions. Final Rule at 86,784-86. The basis of the Department's conclusory dismissal may have been illuminated by the text of footnote 54, but it was omitted.  Final Rule at 86,785.

110.     EPI also estimated that employment in non-tipped food service occupations will decline by 5.3 percent and employment in tipped occupations will increase by 12.2 percent, resulting in 243,000 jobs shifting from being non-tipped to being tipped, while wages will decline overall. *Id.*

---

[4] https://downloads.regulations.gov/WHD-2019-0004-0423/attachment_1.pdf

[5] https://www.epi.org/blog/workers-will-lose-more-than-700-million-dollars-annually-under-proposed-dol-rule/

111.    Instead, without explanation, the Department makes the unfounded suggestion that employers might not use the enabling mechanism provided by the Final Rule to use tips to supplement payroll expenses. 85 Fed. Reg. at 86,785-86.

112.    The restaurant industry, which employs sixty percent of all tipped workers, has a disturbingly high rate of wage and hour violations; in its 2010-12 compliance sweep of nearly 9,000 full-service restaurants, the Department found that a staggering 83.8 percent of the restaurants it investigated violated wage and hour laws. Sylvia A. Allegretto and David Cooper, *Twenty-Three Years and Still Waiting for Change: Why it's Time to Give Tipped Workers the Regular Minimum Wage* 7, 18 Economic Policy Institute (Jul. 10, 2014).[6]

113.    That included 1,170 tip credit violations, which cost workers $5.5 million in lost income. *Id*. at 18.

114.    By permitting employers to reference O*NET to determine "related" job duties, the Rule also dramatically expands the universe of duties that can be performed by tipped workers without running afoul of the FLSA.

115.    Because O*NET compiles lists of task assignments reported in surveys and does not objectively evaluate whether a task is actually related to a given occupation or how much time workers spend on given tasks within an occupation, its incorporation into the Final Rule obliterates any meaningful distinction between tipped and non-tipped occupations. *See* O*NET Online, *Data Collection Overview*.[7] Because it seeks to describe the work world as it is, not as it should be, O*NET cannot and does not account for FLSA violations in industries known to have

---

[6] https://www.epi.org/files/2014/EPI-CWED-BP379.pdf.

[7] https://www.onetonline.org/dataCollection.htm.

high violation rates like the restaurant industry; therefore, using it to determine related duties will sanction conduct that has been prohibited under the FLSA for decades.

116.     The Final Rule thus creates an economic incentive to turn non-tipped positions into tipped jobs, which would allow employers to take the tip credit and use tip pool funds that would normally have gone to tipped employees to subsidize employers' minimum wage obligations. Alternatively, an employer may eliminate certain positions altogether, resulting in increased unemployment, and shift the duties that non-tipped employees perform onto tipped employees.

117.     For example, O*NET tasks for waiters and waitresses include "cleaning duties, such as sweeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and cleaning bathrooms"—when from 1988 until 2018, the Department's Field Operations Handbook specified as an example, "maintenance work (e.g., cleaning bathrooms and washing windows) [is] not related to the tipped occupation of a server; such jobs are non-tipped occupations." Catherine Ruckelshaus, *Comments in Response to Proposed Rulemaking: Tip Regulations Under the Fair Labor Standards Act*, National Employment Law Project (Dec. 11, 2019).[8]

118.     For those reasons, incorporating the O*NET occupational listings into the Final Rule is arbitrary and capricious itself.

119.     Moreover, the Department acknowledges that the Final Rule will primarily benefit employers. 85 Fed. Reg. at 86,786.

120.     The Final Rule allows employers to take a tip credit even when their employees are completing tasks which do not produce tips—doing more work for less pay—with no cap on

---

[8] https://downloads.regulations.gov/WHD-2019-0004-0453/attachment_1.pdf

the amount of time a worker may spend on non-tipped duties. It allows employers to capture the tips of workers by roundabout means.

121.     The Department's indifference to the harm the Final Rule will cause to workers is arbitrary and capricious and undermines the Department's purpose to "foster, promote, and develop the welfare of the wage earners." 29 U.S.C. § 551.

### ii. The Department failed to articulate valid reasons for its departure from decades of consistent application of the Dual Jobs regulation.

122.     The Final Rule is arbitrary and capricious because the Department failed to articulate sufficient reasons for its departure from decades of consistent application of the Dual Jobs regulation and the reliance interests that application has engendered.

123.     The Department's conclusory claim that the 80/20 rule has created some confusion and inconsistent application is unsupported by facts and fails to provide a valid reason for abandoning the 80/20 rule that several Plaintiff states have long looked to for guidance.

### iii. The 80/20 rule has not proven difficult for courts to apply.

124.     In its attempt to demonstrate that the "practical difficulties of complying with the 80/20 approach are . . . evident in case law[,]" the Department cites only one case, *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306 (S.D. Fla. 2007), *aff'd*, 291 F. App'x 310 (11th Cir. Sept. 3, 2008) (per curiam). However, that case did not even apply the 80/20 rule, much less justify its rescission.

125.     The *Pellon* court found that a determination of how much of the plaintiff skycaps' time was spent on non-tipped duties was "infeasible" because of the lack of evidence, noting several of the plaintiffs "admitted that dividing their workday among the various tasks they perform is impractical or impossible." 528 F. Supp. 2d at 1313-14.   Applying the 80/20 rule was simply not necessary because the plaintiff skycaps did not offer evidence that the non-tipped

duties they performed consumed more than twenty percent of their working time. 528 F. Supp. 2d at 1314.

126.     In affirming the decision of the trial court, the United States Court of Appeals for the Eleventh Circuit did not abrogate the 80/20 rule, nor characterize it as impractical or "infeasible"; rather, it issued a one-page per curiam decision affirming the court's determination that the skycaps failed to demonstrate that they spent substantial time doing non-tipped work. 291 Fed. App'x at 310.

### iv. The Final Rule is vague and will result in increased litigation, not less.

127.     The Department engaged in unnecessary rulemaking to implement changes unrelated to the FLSA amendment contained in the 2018 CAA. The 20 percent limitation on non-tipped hours has been consistently and easily applied for more than thirty years. Defendants' amorphous standard provides only murkiness, not clarity, and replaces a bright line rule— belying the stated purpose of the Final Rule.

128.     The ill-defined limits of the "contemporaneous with" or "for a reasonable time immediately before or after" provisions are certain to cause a flood of new litigation. The Final Rule defines neither phrase.

129.     The Department never provides a precise definition of "contemporaneous," simply stating that it means "during the same time as" before making the caveat that it "does not necessarily mean that the employee must perform tipped and non-tipped duties at the exact same moment in time." 85 Fed. Reg. at 86,768.

130.     The Department stated that "the allowance for related duties performed 'for a reasonable time immediately before or after' a tipped duty creates a sufficiently intelligible distinction between employees engaged in tipped occupations and non-tipped occupations." *Id.*

131. Neither the Department's definitions nor its bellhop example, discussed *supra*, provide any guidance as to when–or whether–a worker could be deemed a dual employee during a shift or how long before or after a shift constitutes a "reasonable time." And, in the example of the bellhop, the worker could be entitled only to the sub-minimum wage for an entire shift one day (the busy day, in the example) but entitled to minimum wage for part of the shift the next day (the two hours of non-tipped duties after the shift). The Department criticizes the 80/20 rule for treating twelve minutes of non-tipped work per hour during a ten hour shift the same as two hours of non-tipped work immediately after an eight hour shift. But the Final Rule would treat virtually any amount of non-tipped work per hour the same no matter the length of the shift, so long as it is performed "contemporaneously" with tipped duties, and does not expressly prohibit one and half hours of time at the end of an eight hour shift or two hours at the end of a ten hour shift.

132. Further, because the Final Rule focuses on the timing of tasks rather than the proportion of tip-producing duties, a worker could be deemed a dual employee on one day and a solely tipped worker the next.

133. The Final Rule's new related duties standard not only radically departs from decades of agency practice, but will make it more difficult for workers, businesses, and state enforcement agencies that have relied on the 80/20 rule to determine whether a tipped worker is employed in dual occupations.

## II.     Plaintiffs Will Suffer Irreparable Harm as a Result of Defendants' Actions

134. The Final Rule harms Plaintiffs' quasi-sovereign and proprietary interests, including by harming Plaintiffs' residents, directly diminishing Plaintiffs' tax revenue, increasing the costs of funding and administering Plaintiffs' public benefit programs, and inflicting substantial and burdensome administrative and enforcement costs on Plaintiffs' state agencies.

135.    Many of the Plaintiff States, including Pennsylvania, Maryland, and Michigan, rely on the 80/20 rule by incorporating federal law, through similar or identical provisions of state law, or judicial decisions.[9]

136.    Because the states rely on federal law for the 80/20 rule, its effects will be immediate and far-reaching.

137.    The likely increase in non-tipped work performed by tipped workers due to the Final Rule will directly harm Plaintiffs in at least three ways. First, the Final Rule will lower wages and decrease compliance with minimum wage laws, harming workers in Plaintiffs' States. Second, reduced wages for tipped workers will directly reduce Plaintiffs' tax revenue. Third, the Final Rule will impose administrative and regulatory costs on Plaintiffs and their state agencies, including increasing expenditures on public benefits they fund or administer. All of these effects will require the expenditure of funds which cannot be recovered from Defendants.

**A.    The Final Rule Will Harm Workers in the Plaintiff States.**

138.    The Final Rule causes direct economic injury to Plaintiffs.

139.    As discussed *supra*, the Final Rule will lead to tipped employees spending a more significant amount of time each shift performing non-tipped work while earning the lower tipped minimum wage rate, thus reducing their opportunity to earn more tips.

140.    With less opportunity to earn tips, tipped employees' hourly rate of pay will decrease, resulting in a lower take-home pay.

141.    Additionally, prior to the issuance of the Final Rule, workers in tipped occupations, especially service workers, were more likely than workers in other occupations to

---

[9] Other states, such as Massachusetts, informally look to the Department's 80/20 rule for guidance.

experience minimum wage violations.[10] Indeed, service workers made up 46.5 percent of workers who experienced minimum wage violations.[11]

142.     The Final Rule will lead to a continuation of minimum wage violations suffered by service workers as now it will be difficult for employees to determine when they should be paid the regular minimum wage rate instead of the tipped minimum wage rate for their time spent on non-tipped duties.

143.     The Department issues the Final Rule as service-sector workers are already in a particularly vulnerable position due to the COVID-19 pandemic; indeed, as of November 2020, 1,303,000 workers in the food services industry were unemployed. Bureau of Labor Statistics, *Unemployed persons by industry, class of worker, and sex* (Dec. 4, 2020).[12]

144.     Those 1,303,000 workers represent 13.8 percent of the workforce of the food services and drinking places subsector. Bureau of Labor Statistics, Workforce Statistics.[13]

145.     Some tipped workers have reported being unable to access unemployment compensation benefits because their wages were too low to meet the minimum qualification threshold. *See, e.g.,* One Fair Wage, *Locked Out by Low Wages: New York Service Workers' Challenges With Accessing Unemployment Insurance During COVID-19*, 3 (Jun. 2020).[14]

146.     Those who are working are in even more precarious positions than they were before the pandemic. A survey of service workers from New York, New Jersey, Massachusetts,

---

[10] https://www.epi.org/publication/employers-steal-billions-from-workers-paychecks-each-year/

[11] Id.

[12] https://www.bls.gov/web/empsit/cpseea31.htm

[13] https://www.bls.gov/iag/tgs/iag722.htm#workforce

[14] https://onefairwage.site//wp-content/uploads/2020/11/OFW_LockedOut_NY_2.pdf

Illinois, and Pennsylvania found that 83 percent of respondents experienced a decline in tips during the pandemic, with 63 percent reporting that tips had fallen by at least 50 percent. One Fair Wage et al., *Take Off Your Mask So I Know How Much To Tip You: Service Workers' Experience of Health & Harassment During COVID-19*, 3 (Nov. 2020).[15]

147. Sixty-seven percent of respondents have received a lesser than usual tip after enforcing COVID-19 safety protocols with customers. *Id.*

148. Workers have also seen a dramatic increase in sexual harassment; many women in the service industry have had to contend with "requests from male customers that female service workers remove their mask so that they could judge their looks, and, implicitly, determine their tips on that basis." *Id.*

149. As businesses look to meet the financial struggles brought on by the pandemic, the Final Rule hands them a way to transfer their labor costs on to tipped workers. Tipped workers could ill afford the $700 million transfer even in a healthy economy; taking money out of the pockets of tipped workers as the pandemic rages is sure to leave many destitute.

150. Tipped workers, a difficult group to define with accuracy, are among the most vulnerable and lowest paid in our states. For example, in Pennsylvania, the average restaurant server earns $25,380 annually, bartenders earn $24,360, bellhops and baggage handlers earn $28,150, and manicurists and pedicurists earn $21,630. Dep't of Labor, Bureau of Labor Statistics, *May 2019 State Occupational Employment and Wage Estimates Pennsylvania* (35-3031, 35-3011, 39-6011, 39-5092).[16] In Illinois, the average is $23,340, $24,480, $25,280, and

---

[15] https://onefairwage.site/wp-content/uploads/2020/11/OFW_COVID_WorkerExp_Emb-1.pdf

[16] https://www.bls.gov/oes/current/oes_pa.htm#39-0000

$24,580, respectively. *Id.* (Illinois).[17] In Massachusetts, the average is $32,970, $31,690, $32,170, $31,690, and $28,620 per year. *Id.* (Massachusetts).[18] A fourteen percent reduction—to use the Department's example—or more would be devastating.

151.    Service industry employers desperately need economic relief but it cannot come out of the pockets of their lowest paid workers.

**B.    The Final Rule Will Directly Reduce the Plaintiffs States' Tax Revenue.**

152.    As the Final Rule lowers workers' pay, it will also lower the income tax receipts for Plaintiffs' States.

153.    In addition, as the Department admits, the Final Rule will cause workers to shift some responsibilities for non-tipped work to tipped workers, resulting in a loss of non-tipped jobs. The increased unemployment will decrease Plaintiffs' income tax revenue and increase reliance on Plaintiffs' public benefits.

**C.    The Final Rule Will Impose Administrative and Regulatory Costs on the Plaintiff States and Their Agencies by Increasing Reliance on Public Benefits.**

154.    The Final Rule will cause more vulnerable, low-wage workers to seek and qualify for public benefits that the states fund or administer.

155.    In Pennsylvania, as noted above, the average restaurant server earns $25,380 per year. Manicurists and pedicurists earn $21,630.

156.    Using the Department's example, 2019 NPRM at 53,972, a fourteen percent decrease in wages will result in the average Pennsylvania restaurant server earning $21,826. If the server is the head of a two-person household, that server would have been ineligible for

---

[17] https://www.bls.gov/oes/current/oes_il.htm#39-0000

[18] https://www.bls.gov/oes/current/oes_ma.htm#35-0000

Medicaid and SNAP benefits administered by Pennsylvania but now would become eligible. In addition, the server will be more likely to require other public benefits for which he or she already qualified. Other benefits include: unemployment compensation for those non-tipped employees whose positions are eliminated in order to have tipped employees perform the same duties; Medicaid ($22,929.20 threshold for a two-person household); Supplemental Nutrition Assistance Program ("SNAP") ($21,984 threshold for a two-person household); Temporary Assistance for Needy Families ("TANF") (resources valued at $1,000 or less); Low Income Home Energy Assistance Program ("LIHEAP") ($25,860 threshold for household income); child care subsidies ($34,480 threshold for two-person household); Children's Health Insurance Program ("CHIP") ($22,390-35,860 household income); Women Infants Children ("WIC") ($31,894 threshold for two-person household); and local housing programs (varies by region).

157.    The Final Rule will cause more Pennsylvania workers to be eligible for more benefits that the Commonwealth funds or administers, or receive higher amounts.

158.    In Pennsylvania, the leisure and hospitality industry has accounted for as much as 24.8% of continuing unemployment claims. Pa. Dep't of Labor & Indus., *Claims by Industry and Week: Continuing Claims by Industry and Week* (2021) (last accessed Jan. 1, 2021) (showing that the leisure and hospitality industry accounted for 24.8% of continuing claims during the week ending Jun. 27, 2020)

159.    In Illinois, the average restaurant server earns $23,340 per year. Dep't of Labor, Bureau of Labor Statistics, *May 2019 State Occupational Employment and Wage Estimates Illinois* (35-3031).[19] Manicurists and pedicurists earn $24,580. *Id.* (39-5092).[20]

---

[19] https://www.bls.gov/oes/current/oes_il.htm#35-0000

[20] https://www.bls.gov/oes/current/oes_il.htm#39-0000

160.     Using the Department's example, 2019 NPRM at 53,972, a fourteen percent decrease in wages will result in the average Illinois restaurant server earning $20,072.40. If the server is the head of a two-person household, that server previously ineligible for Medicaid and SNAP benefits administered by Illinois would now become eligible. In addition, the server will be more likely to require other public benefits for which he or she already qualified. Other benefits include: unemployment compensation for those non-tipped employees whose positions are eliminated in order to have tipped employees perform the same duties; Medicaid ($23,929.20 threshold for a two-person household);[21] Supplemental Nutrition Assistance Program ("SNAP") ($28,452 threshold for a two-person household); Temporary Assistance for Needy Families ("TANF") (resources valued at $1,000 or less); Low Income Home Energy Assistance Program ("LIHEAP") ($25,860 threshold for a two-person household)[22]; child care subsidies ($34,488 threshold for two-person household);[23] Children's Health Insurance Program ("CHIP") ($25,860-39,300 household income);[24] Women Infants Children ("WIC") ($31,894 threshold for two-person household); and local housing programs (varies by region).

161.     The Final Rule will cause more Illinois workers to be eligible for more benefits that the State funds or administers.

162.     Due to the impact of COVID-19 mitigations to minimize the spread of the virus in the community, thousands of Illinois workers lost their jobs, many of which were in tipped occupations.

---

[21] https://www.benefits.gov/benefit/1628

[22] https://www.benefits.gov/benefit/1556

[23] https://www.dhs.state.il.us/page.aspx?item=118832

[24] https://www.benefits.gov/benefit/1601

163.     In Illinois, the leisure and hospitality industry has accounted for as much as 34.1% of jobs lost over the last year.[25] In particular, the accommodation and food services industry account for 88.5% of those jobs lost. *Id.*

164.     Now with the Department's Final Rule being issued, many of these workers who either saw their incomes significantly decreased, if not eliminated completely, by the pandemic are at risk of experiencing a more permanent decrease in their wages.

165.     The rash abandonment of the 80/20 rule will force states like Illinois and Maryland that have looked to the FLSA and the Department Regulations for the last three decades to consider their own rule-making to prevent workers within the state from being harmed by the operation of the Final Rule.  To promulgate its own rule the Illinois Department of Labor (IDOL), like other states, would have to invest significant resources to research, draft, propose, and implement an appropriate tipped worker rule in compliance with the Illinois Administrative Procedure Act. IDOL would also have to devote significant resources to publish the proposed rule in the Illinois Register, solicit and review public comment, hold a public hearing, and obtain approval from the Joint Committee on Administrative Rule, a bipartisan legislative oversight committee which conducts systematic reviews of administrative rules proposed by Illinois agencies. Adopting a new rule is a resource-intensive process that will require Illinois to incur significant regulatory and administrative expense.

166.     In the District of Columbia, the average restaurant server earns $49,570 per year. Dep't of Labor, Bureau of Labor Statistics, *May 2019 State Occupational Employment and Wage*

---

[25] https://illinois.virtuallmi.com/vosnet/analyzer/resultsNew .aspx?session=indces&lmidbl=1

*Estimates District of Columbia* (35-3031).[26] Manicurists and pedicurists earn $36,420. *Id.* (39-5092).[27]

167.     Using the Department's example, 2019 NPRM at 53,972, a fourteen percent decrease in wages will result in the average District restaurant server earning $42,630. If the server is the head of a three-person household, that server previously ineligible for DC Healthcare Alliance coverage (a District-funded program designed to provide medical assistance to District residents who are not eligible for Medicaid) and SNAP benefits administered by the District would now become eligible. In addition, the server will be more likely to require other public benefits for which he or she already qualified.

168.     The Final Rule will cause more District workers and their families to be eligible for more public benefit programs that the District funds or administers. The District's administrative costs and burdens would increase under the Final Rule while simultaneously forcing the District to redirect resources away from essential program activities towards administrative tasks.

169.     In Maryland, the average restaurant server earns $25,910 per year. Dep't of Labor, Bureau of Labor Statistics, *May 2019 State Occupational Employment and Wage Estimates Maryland* (35-3031).[28] Manicurists and pedicurists earn $25,130. *Id.* (39-5092).[29]

170.     Using the Department's example, 2019 NPRM at 53,972, a fourteen percent decrease in wages will result in the average Maryland restaurant server earning $22,282. If the server is the head of a two-person household, that server previously ineligible for Medicaid

---

[26] https://www.bls.gov/oes/current/oes_dc.htm#35-0000

[27] https://www.bls.gov/oes/current/oes_dc.htm#39-0000

[28] https://www.bls.gov/oes/current/oes_md.htm#35-0000

[29] https://www.bls.gov/oes/current/oes_md.htm#39-0000

($23,796 threshold for a two-person household) and SNAP benefits ($22,412 threshold for a two-person household) administered by Maryland would now become eligible. In addition, the server will be more likely to require other public benefits for which he or she already qualified.

171.     The Final Rule will cause more Maryland workers to be eligible for more benefits that the State funds or administers.

172.     In Michigan, workers who customarily receive tips are only required to receive 38 percent of the applicable minimum wage; provided, however, that that amount plus their tips equal the minimum wage or the employer must make up the shortfall. Mich. Comp. Laws § 408.934d. Tipped workers in Michigan will see a significant reduction in their overall income if they are required to spend more of their time performing services that do not generate tips.

173.     According to DOL labor statistics as of May 2018, of over 4.3 million total employees, Michigan employs 80,880 waiters and waitresses with average annual earnings of $23,920 and employs 17,500 bartenders with average annual earnings of $24,070. These two categories make up roughly 25 percent of the food preparation and service industry in Michigan. While there are certainly other types of employment that may rely on tips as their primary source of income, these are the two most obvious categories of workers in Michigan who are likely to be affected by DOL's final rule. This means that at least 100,000 Michigan workers could be subjected to spending more than 20 percent of their time performing duties that do not generate tips while still being paid below minimum wage for those services.

174.     And also in Michigan, if low-income workers' wages are further reduced and if jobs are eliminate as is very likely to occur, this necessarily increases the strain on food assistance and other programs provided by Michigan. Notably, DOL statistics show that Michigan wait staff and bartenders receive *the lowest* median hourly wages of all reported

industries. Considering that Michigan is already facing budget shortages for needed services, increasing the demand for these services by eliminating the 80/20 rule would only make matters worse.

175.     In addition, Plaintiffs will have to conduct outreach and education, and consider legislative or regulatory action to reverse the harm.

## CAUSES OF ACTION

### COUNT I

### Violation of Administrative Procedure Act—Not in Accordance with Law

176.     Plaintiffs incorporate by reference the foregoing paragraphs as if they were set forth fully herein.

177.     Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

178.     The Final Rule's provisions eliminating the twenty percent cap on tipped work, imposing a willfulness standard, and narrowing the range of conduct that qualifies as "willful" are contrary to the Fair Labor Standards Act and federal judicial decisions interpreting the statute as described.

179.     The Final Rule is therefore "not in accordance with law" as required by the APA. 5 U.S.C. § 706(2)(A).

180.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### COUNT II

### Violation of Administrative Procedure Act—Arbitrary and Capricious

181.     Plaintiffs incorporate by reference the foregoing paragraphs as if they were set forth fully herein.

182.     The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

183.     The Final Rule is arbitrary and capricious because it fails to justify its departure from decades of policy and practice, runs counter to the evidence before the agency, relies on factors Congress did not intend the agency to consider, disregards material facts and evidence, and fails to consider important aspects of the issue, including how the Final Rule will harm tipped workers.

184.     The Final Rule is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A).

185.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs request that this Court enter judgment in its favor and grant the following relief:

a.  Declare that the challenged provisions of the Final Rule are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

b.  Vacate and set aside the challenged provisions of the Final Rule;

c.  Preliminarily and permanently enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the challenged provisions of the Final Rule;

d.  Award Plaintiffs reasonable fees and costs, including attorneys' fees pursuant to 28 U.S.C. § 2412; and

e.  Grant such other and further relief as the Court deems just and proper.


DATED: January 19, 2021                          Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER

By: */s/ Nancy A. Walker*
NANCY A. WALKER
Chief Deputy Attorneys General
RYAN B. SMITH
LISA E. EISENBERG
Deputy Attorneys General
Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
(717) 941-0749
nwalker@attorneygeneral.gov

*Attorneys for the Commonwealth of
Pennsylvania*

KWAME RAOUL
Attorney General of the State of Illinois

By: */s/Alvar Ayala*
ALVAR AYALA*
Chief, Workplace Rights Bureau,
LYDIA COLUNGA-MERCHANT*
Deputy Chief, Workplace Rights Bureau
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
(312) 343-0099
aayala@atg.state.il.us

*Attorneys for the State of Illinois*

KATHLEEN JENNINGS
Attorney General
State of Delaware

CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation

By: */s/ Vanessa L. Kassab*
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 577-8600
Vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

KARL A. RACINE
Attorney General for the District of Columbia

By: */s/ Kathleen Konopka*
KATHLEEN KONOPKA*
Deputy Attorney General
Public Advocacy Division
ALACOQUE HINGA NEVITT
Assistant Attorney General
District of Columbia Office of the Attorney
General
400 6th Street, NW
Washington, D.C. 20001
202-724-6610 (phone)
kathleen.konopka@dc.gov

*Attorneys for the District of Columbia*

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN
*Solicitor General*

By: */s/ Jeffrey P. Dunlap*
JEFFREY P. DUNLAP*
*Assistant Attorney General*
200 St. Paul Place
Baltimore, MD 21202
T: (410) 576-7906
F: (410) 576-6955
jdunlap@oag.state.md.us

*Attorneys for the State of Maryland*

DANA NESSEL
Attorney General of the State of Michigan

FADWA A. HAMMOUD
*Solicitor General*

By: */s/ Zachary A. Risk*
ZACHARY A. RISK*
JOSEPH T. FROEHLICH
DEBBIE K. TAYLOR
*Assistant Attorneys General*
Michigan Department of Attorney General
Labor Division – Payroll Fraud Enforcement
Unit
PO Box 30736
Lansing, MI 48909
(517) 335-1950
RiskZ1@michigan.gov
FroehlichJ1@michigan.gov
TaylorD8@michigan.gov

*Attorneys for Dana Nessel, on behalf of the
People of Michigan*

MAURA HEALEY
Attorney General of the Commonwealth of
Massachusetts

By: */s/ Amanda I. Morejón*
AMANDA I. MOREJÓN*
*Assistant Attorney General, Fair Labor
Division*
Office of the Attorney General Maura Healey
1 Ashburton Place
Boston, MA 02108
617-963-2037
Amanda.Morejon@mass.gov

*Attorney for the Commonwealth of
Massachusetts*

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General

By: */s/ Estelle Bronstein*
ESTELLE BRONSTEIN*
MELISSA MEDOWAY
Deputy Attorneys General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
estelle.bronstein@law.njoag.gov
609-789-2152

*Attorneys for Plaintiff State of New Jersey*

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Joseph J. Wardenski*
JOSEPH J. WARDENSKI, *Senior Trial
Counsel**
FIONA J. KAYE, *Assistant Attorney General*
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
(212) 416-8441
Joseph.Wardenski@ag.ny.gov

*Attorneys for the State of New York*

* *Application for admission pro hac vice forthcoming.*